In re Christopher Kevin LETT and Patricia Lynn Lett, Debtors.

First American Title Insurance Company, Plaintiff,

v.

Christopher Kevin Lett and Patricia Lynn Lett, Defendants.

Green Tree Financial Servicing, Plaintiff,

v.

Christopher Kevin Lett and Patricia Lynn Lett, Defendants.

Bankruptcy No. 98–43720–JWV. Adversary Nos. 98–3029–SW, 98–3030–SW.

United States Bankruptcy Court, W.D. Missouri, Southwestern Division.

Aug. 24, 1999.

**174**

Thomas J. O'Neal, Springfield, MO, Michael Gould, Kansas City, MO, for plaintiff.

Thomas Williams, Joplin, MO, for defendant.

### MEMORANDUM OPINION AND ORDER

JERRY VENTERS, Bankruptcy Judge.

Christopher Kevin Lett and Patricia Lynn Lett ("the Letts" or "Debtors") filed for protection under Chapter 7 of the Bankruptcy Code on September 3, 1998. On their Schedules, the Debtors listed First American Title Insurance Company ("First American") as an unsecured creditor holding a disputed claim for $76,041.41, and Green Tree Financial Servicing Corporation ("Green Tree") as an unsecured creditor holding an undisputed claim of $27,296.25. The debt owed to First American arises from a claim on a title insurance policy made by Johnny and Tammy Boshears who purchased real estate from the Debtors. Green Tree's claim arises from the Debtors' sale of a mobile home in which Green Tree purportedly held a security interest.

On December 2, 1998, First American filed a four-count Complaint against the Debtors seeking: (1) a determination that the $76,041.41 debt owed to it is nondischargeable under 11 U.S.C. § 523(a)(2)(A)

and that First American is entitled to $25,-000.00 for attorneys' fees and cost of collection pursuant to the terms of the Note and Deed of Trust signed by the Debtors and assigned to First American; (2) a denial of discharge pursuant to 11 U.S.C. § 727(a)(2)(A); (3) the imposition of a constructive trust on real estate located in Kansas and allegedly purchased with funds fraudulently obtained through the sale of the Debtors' Missouri real estate; and (4) a determination that the lien obtained pursuant to a judgment entered by the Kansas District Court on September 24, 1998, is valid. Additionally, on July 14, 1999, First American filed a Motion for Leave to File First Amended Complaint and submitted the First Amended Complaint in which First American included 11 U.S.C. § 523(a)(6) as an additional ground for its claim of nondischargeability in Count I of its Complaint. The Court will rule on that Motion as a part of this Memorandum Opinion and Order.

Also on December 2, 1998, Green Tree filed a two-count Complaint against the Debtors seeking a determination of nondischargeability. Both counts cite 11 U.S.C. § 523(a)(2)(A) as the basis for the determination of nondischargeability but allege different factual grounds. Count I alleges that the Debtors fraudulently obtained an extension of credit from Green Tree to purchase a mobile home, and Count II alleges that the Debtors committed fraud when they failed to disclose Green Tree's security interest upon the sale of the mobile home to a third party (the Boshears). Green Tree also raised 11 U.S.C. § 523(a)(6) in its post-trial brief as an additional ground for excepting from discharge the debt owed to it.

The Debtor has raised various counterclaims that include, *inter alia*, claims for attorney's fees pursuant to 11 U.S.C. § 523(d).[1]

---

1. In Count II of their Answer and Counterclaim, the Debtors make the argument that First American has, by alleging that the Debtors committed fraud and used the fraudulently obtained proceeds to buy a homestead exempt under Kansas law, somehow infringed

On February 2, 1999, the Court issued an Order consolidating the two abovementioned adversary proceedings, and on June 23, 1999, the Court a held joint hearing at the Federal Courthouse in Joplin, Missouri, after which the Court took the matter under advisement and granted the parties additional time to submit post-trial briefs. The Court has read the briefs, conducted its own independent research and is now ready to rule.

This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I) and (J), and this Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(a).[2]

### FACTS

In August 1995, the Debtors purchased an approximately 20–acre tract of land in Jasper County, Missouri, and gave Southwest Missouri Bank of Joplin a Future Advance Deed of Trust dated August 21, 1995, on the entire property to secure a loan in the original amount of $77,000.00. At approximately the same time they were purchasing the real estate, the Debtors began discussions with Serenity Homes, Inc., of Tulsa, Oklahoma ("Serenity Homes"), for the purchase of a double-wide mobile home or manufactured home to be placed on the Missouri real estate. Apparently on August 15, 1995, the Debtors provided Serenity Homes with the necessary information to complete a credit application for the purpose of financing the purchase of the mobile home. This information was transmitted by Serenity Homes to Green Tree and a typewritten credit application was prepared; however, the Debtors did not sign the credit application until September 20, 1995. The credit application did not disclose the newly incurred debt to Southwest Missouri Bank nor any of the numerous other debts which eventually were listed on the Debtors' bankruptcy schedules.

On October 4, 1995, the Debtors signed an installment contract and security agreement agreeing to purchase a 1994 Fuqua mobile home, financing $28,186.50 of the total purchase price of $30,900.00 and granting a security interest in the mobile home to Green Tree. Green Tree properly secured its interest in the mobile home by having its lien noted on the Certificate of Title.

The retail installment contract provided, among other things, that the Debtors agreed to not attach the mobile home to any real estate. It further provided that the mobile home would always be treated as personal property unless Serenity Homes and Green Tree consented in writing and state law permitted a contrary treatment. The contract contained a bold-face typewritten notice immediately above the Debtors' signature lines advising the Debtors, as buyers, not to sign the contract before reading it. Despite that notice, the Debtors did not read the contract before signing it.

The evidence was contradictory as to whether the Debtors told the salesman for Serenity Homes that the Debtors intended to place the mobile home on a permanent foundation and add extra rooms to the home. The Debtors contended that they advised the salesman that the mobile home was not large enough for their needs and would have to be added to, and asserted that the salesman told them that, once the mobile home was delivered to the Debtors, they could do what they pleased with it. The salesman, on the other hand, testified that he didn't recall any conversations with the Debtors about the Debtors adding to

on the Debtors' 14th Amendment constitutional right to travel. Aside from failing to provide any coherent legal support for this argument, Debtors also badly misconstrue the facts. The Plaintiff in this case (First American) is not trying to prevent the Debtors from moving to Kansas; it just wants to prevent the Debtors from buying a house there with (allegedly) Plaintiff's money.

**2.** This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law as required by Rule 7052, Fed.R.Bankr.P.

the home or putting it on a permanent foundation. In any event, Lett testified that his changes in and additions to the mobile home were planned before he purchased the mobile home. Lett admitted that he intended to change the character of the mobile home and make it look more like a house instead of a mobile home. Photographs admitted in evidence showed that he had succeeded in that endeavor.

The mobile home was delivered to the Debtors' real estate in Jasper County soon after the contract was signed. The men who delivered the mobile home for Serenity Homes placed the mobile home on small concrete block pillars and it was secured to the ground by means of steel cables fastened to metal rods driven into the ground. Over the course of the next several months, the Debtors, as they had planned to do before purchasing the mobile home, added bedrooms, a bathroom, a garage, and a patio and deck to the mobile home. They also changed the roof line and placed the home on a permanent concrete foundation faced with brick. With the addition of siding, a white picket fence, and a small amount of landscaping, the Debtors, by all appearances, converted the mobile home into a full-sized permanent home on the property.

In early 1997, Lett began discussions with Ronnie Perry about a sale to Perry of a portion of the Debtors' real estate. Lett approached Southwest Missouri Bank to discuss a possible release of the bank's security interest in a portion of the property. The bank told Lett that the property would have to be surveyed, an appraisal would have to be made of the property that would remain subject to the bank's Deed of Trust, and it would have to have a copy of the contract with Perry. Lett arranged for the survey and appraisal to be made. The survey divided the Letts' property into two tracts—Tract No. 1 would be sold to Perry and Tract No. 2 would be retained by the Letts. The appraisal showed that the property that the Letts would continue to own (Tract No. 2)

would have an approximate value of $120,000.00, well in excess of the bank's mortgage. Inasmuch as no contract had been entered into with Perry at that time, the Letts did not provide the bank with a copy of any contract. (In fact, it appears that a contract was never supplied to the bank.)

Despite the lack of any contract with Perry, the bank, for some unexplained reason, recorded a Corporation Deed of Release (Partial) for the apparent purpose of releasing from its Deed of Trust the portion of the property being sold to Perry. The Deed of Release recited that the release was being given for consideration of no payment and that the deed was in partial satisfaction of the bank's August 1995 Deed of Trust. In the legal description of the Deed of Release, the deed described the *entire* property owned by the Letts, exactly as shown on the Deed of Trust, except that it included the following phrase at the end of the legal description: "and except tract 2." This Deed of Release (Partial) was recorded in April 1997, but the Letts did not learn of its recording until early in 1998.

Toward the end of 1997, Mr. Lett resumed his discussions with Perry for the sale of a portion of the real estate. Apparently, the men agreed in December 1997 on the transaction, providing that Perry would pay $60,000.00 for Tract No. 1.

At the same time, Lett became more active in a plan to purchase property in the State of Kansas and to remove his family's residence to Kansas. On December 9, 1997, the Letts applied to Advantage One Mortgage for a loan to purchase property in the area of Galena, Kansas, a short distance from the Debtors' Missouri property. In the course of completing this loan application, Lett told the loan officer, Doris Sorenson, that he was selling all of his real estate in Missouri and was buying property in Kansas because he intended to file bankruptcy, and he would be able to exempt more property in Kansas than he would in Missouri. Sorenson refused to make the loan because of the statements

made by Lett (although another loan officer at Advantage One later took up the application and obtained approval to make the loan).

Then, on December 22, 1997, the Letts entered into a contract with Viron H. Feagan and Minnie F. Feagan to purchase farm property near Galena, Kansas for $125,000.00. Advantage One apparently approved the Letts for a loan of up to $75,000.00 to enable them to purchase the Feagan real estate. However, the transaction with the Feagans fell through when the property did not appraise for at least $125,000.00 and the Feagans refused to lower the price.

The transaction with Perry closed on January 4, 1998, and the $60,000.00 paid by Perry was placed in an escrow account at Hawkins Title Company in Joplin.[3] Either the Letts or Perry (the evidence was contradictory) were represented in this transaction by Cynthia Campbell, an attorney who at that time had her office in the offices of Hawkins Title Company and was employed by Hawkins Title. It is not clear whether Campbell actually represented the Letts in connection with the sale of their property to the Boshears (Lett testified that she did), but it is clear to the Court that Campbell was advising Lett and providing Lett with information concerning the title company's conclusions with respect to the bank's Deed of Trust and the Green Tree lien on the mobile home. At the same time, Campbell was providing legal services to Hawkins Title Company with respect to the Lett–Boshears transaction.

Sometime in late 1997 or perhaps, more likely, in early 1998, Campbell told Lett that the mobile home which the Debtors had financed through Green Tree had become a fixture on the real estate because of the additions and changes that had been made by the Debtors to the mobile home and its placement on a permanent founda-

tion, and therefore Green Tree no longer had a lien against the mobile home. Campbell also advised Lett that Southwest Missouri Bank had released its Deed of Trust on the entire property and therefore the bank no longer had a valid lien against the property. Apparently armed with this knowledge, the Letts entered into a contract for the sale of their remaining Missouri real estate on February 12, 1998, with Johnny H. Boshears and Tammy A. Boshears for $96,000.00. Then, on February 17, 1998, the Letts entered into a contract with Nellie Riley for the purchase of a 79–acre tract of real estate near Galena, Kansas for $140,000.00. Both of these transactions were eventually scheduled to close on March 25, 1998, at Hawkins Title Company.

In preparation for closing the sale of the remaining property to the Boshears, Hawkins Title Company updated and examined the title to the property. The title company did not find the Green Tree lien on the mobile home because the lien had not been recorded in the Jasper County Recorder's Office; the lien was shown only on the Certificate of Title for the mobile home. The title company, as was its normal practice, did not check the records of the Missouri Department of Revenue for liens, particularly in view of the fact that it had not been told of the existence of any such liens on personal property. As for Southwest Missouri Bank's Deed of Trust, the title company concluded, with the advice of attorney Campbell, that the Partial Deed of Release filed by the bank in April 1997 had, in fact, released the entire property from the bank's August 1995 Deed of Trust. As a result, the title commitment issued by the title company did not reflect Green Tree's security interest in the mobile home nor the bank's Deed of Trust on the real estate.

Although Mr. Lett knew that a mistake had been made, particularly with respect

---

**3.** According to the testimony, Tract No. 1 of the Lett property was actually sold to a June Wilson Trust, which in turn sold the tract to Perry. In an attempt to avoid further confusion, the Court will refer to Perry as the purchaser.

to the determination that the bank's Deed of Trust had been released, the Debtors did not advise the title company or anyone else that they believed a mistake had been made. The Debtors remained silent concerning the bank's Deed of Trust. They also remained silent with respect to Green Tree's security interest in the mobile home. They did not tell the title company or the Boshears of Green Tree's lien. Had the Letts told them of these liens, the title company's witnesses testified, the company would have delayed the closing until all questions about the liens could be cleared up.

At the time of and in connection with the closing, the Debtors signed an affidavit in which they stated, among other things, that there were no unpaid "unrecorded mortgages" or "chattel mortgages" which affected the real estate or which might affect any fixtures, appliances or equipment installed in or on the real estate. Representatives of Hawkins Title Company and First American testified that the sale to the Boshears would not have been closed and that title insurance would not have been issued on the property if the Letts had refused to sign this affidavit.

After all closing costs and expenses were paid on the sale of Tract No. 2 to the Boshears, the Debtors received a check for $88,810.47. This check was endorsed by the Debtors and then deposited in the Hawkins Title Company escrow account, along with the $60,000.00 which had been received from the sale of Tract No. 1 to Perry. This total combined amount of $148,810.47 was then used by the Letts to purchase the Riley property in Kansas for $140,000.00, and the Debtors received a check for $8,810.47 for the excess funds.

Soon after the closing had taken place, Southwest Missouri Bank contacted Hawkins Title Company and inquired as to why it had not received payment of the balance owed ($76,041.41) on its mortgage note and Deed of Trust. The title company then advised the bank, for the first time, that it had concluded that the Partial Deed of Release recorded by the bank in April 1997 had, in the title company's opinion, completely released the bank's Deed of Trust on the property. The bank then made demand on First American Title Insurance Company, which had issued the title insurance to the Boshears, and after investigating the matter, First American determined that the claim was a valid claim and should be paid. Accordingly, First American paid the bank $76,041.41 in late June 1998 and took an assignment of the bank's note and Deed of Trust.

Toward the end of April, the title examiner who had closed the Lett–Boshears transaction on March 25, at the instruction of her superiors, telephoned Mr. Lett in an attempt to work out some way to recover the funds that were owed to Southwest Missouri Bank on its Deed of Trust. Lett first told the title company that he didn't know he owed the loan to the bank, then he changed his story and told the title company that his attorney had told him not to worry about the bank's loan because it would not show up on the title commitment or title report. Lett refused to tell the title company who his attorney was (probably because the Letts' attorney at that time was Campbell, who was also the title company's attorney). Although there was a dispute as to who first used the word "fraud," Lett nonetheless told the title company that he did not believe he had committed any fraud.

It was not until April 7, 1998, after the Debtors had closed on the sale of their property to the Boshears, that the Debtors notified Green Tree that the Debtors had placed the mobile home on a permanent foundation and had sold the home. On that date, Lett telephoned Green Tree and advised them of those facts and also advised Green Tree that it was his position that Green Tree no longer had a security interest in the mobile home because the mobile home had been attached to the real estate. Green Tree had no records to show that the Letts had ever notified Green Tree of the changes made in the

home, Green Tree had never consented to the changes that were made, and Green Tree had not given its permission to the Letts to sell the property. At some point in April 1998, Green Tree dispatched an employee to inspect the property and take photographs of the mobile home. The photographs showed that significant changes had been made to the mobile home.

Debtor Christopher Lett's testimony was most revealing as to the Debtors' actions and intentions in the months preceding the March 25, 1998, closing.

Lett admitted that neither he nor his wife told the title company or the buyers about the debt owed to Green Tree and Green Tree's claimed security interest in the mobile home. Lett made a payment to Green Tree that was received on March 27, 1998, just two days after he had sold the mobile home, and he further admitted that he was negotiating an extension agreement with Green Tree even after he had sold the mobile home and before he had told Green Tree that the mobile home had, in fact, been sold.

Lett admitted that when the closing took place on March 25, 1998, on the sale of his property, he knew that a mistake had been made with respect to the release of the bank's Deed of Trust. Lett testified that he became aware of the mistake in late 1997 or early 1998 when his attorney, Cynthia Campbell, told him that the title company had concluded that the bank's Deed of Trust had been completely released, in the title company's opinion. In deposition testimony, Lett said he was "shocked" when Campbell told him that the bank did not (at least in the eyes of the title company) have a lien on the real estate. Lett said he did not talk to the bank or call its attention to the mistake because he "didn't feel the need for it." Lett testified that, at the time of closing, he didn't believe that Southwest Missouri Bank or Green Tree had valid liens on the property being sold. He acknowledged that he knew he had to pay the creditors, but that he simply thought that he did not have to pay them out of the proceeds of the sale.

Lett also testified that when Campbell told him that Green Tree no longer had a lien on his mobile home, he was shocked and amazed and believed that someone had made a mistake. He was aware of this mistake when the closing took place, yet he did not tell anyone about the lien or the possibility of any mistake. He testified that he never intended to pay Southwest Missouri Bank or Green Tree out of the proceeds of the sale, and he never thought the Boshears, as the buyers, would have to pay anything. Lett admitted that he had a plan to sell all of his Missouri property and move to Kansas. He admitted he had talked to an attorney about the available exemptions for property in Kansas, and that he had done research on the Internet concerning the Kansas exemptions. He was aware of Kansas' more liberal homestead exemption as early as the fall of 1997. Asked if he never told anyone about the mistakes on the released Deed of Trust and the Green Tree lien so he could sell his property and leave Missouri, Lett conceded that there was "some truth to that." Lett acknowledged that if he had been required to pay Southwest Missouri Bank and Green Tree out of the proceeds of the sale of his property, he would not have received any money at all from the Boshears transaction and, in fact, would have had to use some of the $60,000.00 he had in escrow at Hawkins Title to pay those liens and obtain their release.

The Debtors did not make any further payments to Green Tree after the payment that was received by Green Tree on March 27. The amount owed Green Tree was $26,675.58. Similarly, the Debtors did not make any payments to Southwest Missouri Bank after their monthly payment of February 1998. The amount owed the bank was $76,041.41. Asked how he was going to pay that amount to the bank, Lett said, "I was going to worry about that later." Lett admitted in his deposition testimony

that he had previously stated that he was sorry that Hawkins Title had been involved in the loss, and further admitted that he had made a statement that, "I wish I could have hung it on Abbey Title [another title company]."

The evidence did not show an active involvement by Mrs. Lett in all of the transactions and dealings that took place. However, Mrs. Lett testified that she knew the Debtors were having financial problems and could not pay their bills and that she totally relied on her husband in their financial matters. Mrs. Lett testified that Mr. Lett was acting on her behalf in all of the transactions that occurred.

On July 16, 1998, First American filed a Complaint against the Debtors in the United States District Court in Kansas seeking monetary damages and the imposition of a constructive trust on the Debtors' Kansas property. When the Debtors failed to respond to the lawsuit, First American, on September 1, 1998, filed a Motion for Default Judgment.

Two days later, on September 3, 1998, the Debtors filed their bankruptcy petition. Neither of the parties filed suggestions in bankruptcy in the Kansas District Court, and that court entered judgment in favor of First American on September 24, 1998.

## DISCUSSION

This case[4] presents the following issues: (1) Are the debts owed to Green Tree and / or First American nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A)? (2) Is the issue of 11 U.S.C. § 523(a)(6) as the basis for nondischargeability properly before the court and, if so, are the debts owed to Green Tree and / or First American nondischargeable under § 523(a)(6)? (3) Should the Debtors be denied discharge pursuant to 11 U.S.C. § 727(a)(2)? (4) Is the Kansas District Court Judgment

4. For the sake of convenience, the two cases which have been consolidated for hearing will

entered September 24, 1998, awarding First American $76,041.41 in monetary damages, plus interest, attorneys' fees and costs, and imposing a constructive trust on the Debtors' Kansas real estate, valid, or if it is not presently valid, can and should the Court validate it? (5) Does the Court have the authority to impose a constructive trust, in favor of First American, on the Debtors' Kansas real estate, and if it does, should it? The Court takes up these issues in order.

### 1. Section 523(a)(2)(A):

Green Tree and First American both cite 11 U.S.C. § 523(a)(2)(A) as one of the bases for their claims of nondischargeability; therefore, we begin with a brief overview of the elements necessary to establish a claim under § 523(a)(2)(A).

Section 523(a)(2)(A) excepts from discharge "any debt for money, property, [or] services ... to the extent obtained, by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). Exceptions to discharge are to be narrowly construed against the objecting creditor and liberally construed in favor of the debtor. *Green Tree Financial Corp. v. Beasley (In re Beasley)*, 202 B.R. 979, 983 (Bankr.W.D.Mo.1996) (citing *In re Wheatley*, 158 B.R. 140, 143 (Bankr.W.D.Mo. 1993)). In order to prevail under § 523(a)(2)(A), a creditor must prove, by a preponderance of the evidence, all of the following elements:

(1) that the debtor made the representations;

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

be referred to collectively as one case.

(4) that the creditor relied on such representations;

(5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.

*In re Pickett,* 234 B.R. 748, 753 (Bankr. W.D.Mo.1999); *Thul v. Ophaug (In re Ophaug),* 827 F.2d 340, 342 (8th Cir.1987); *Field v. Mans,* 516 U.S. 59, 64, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995); *Beasley,* 202 B.R. at 983. We elaborate on the relevant subtleties of these elements in our discussion of the individual issues below.

### a. Green Tree's Complaint—Count I

■ In Count I of its Complaint, Green Tree argues that the Debtors should be denied discharge pursuant to 11 U.S.C. § 523(a)(2)(A) because the Debtors fraudulently obtained an extension of credit from Green Tree. More specifically, Green Tree contends that at the time the Debtors entered into the contract for the purchase of the mobile home from Serenity Homes, in order to obtain the financing from Green Tree, the Debtors represented to Green Tree, via the contract, that they would not take any action in derogation of Green Tree's security interest in the mobile home, then classified as personal property. Green Tree maintains, however, that at the time the Debtors obtained financing from Green Tree, their true intentions were to deprive Green Tree of its security interest by affixing the mobile home to the real estate on which it was placed (in clear contravention of the contract they had just signed),[5] thereby converting the mobile home from personal property to real property and defeating or "extinguishing" Green Tree's security interest.[6] In response, the Debtors admit that they intended to affix the mobile home to their land at the time they signed the contract, but counter that they did not and could not have deceived Green Tree by doing this. The Debtors contend that because they had planned on affixing the mobile home to the land prior to purchasing it and made these intentions known to Serenity Homes at the time of purchase and on a number of occasions prior to the date of purchase, they could not have committed fraud; Serenity Homes (and Green Tree by association)[7] did not rely on the Debtors' representations in the contract and the Debtors could not have deceived or had the intent to deceive Green Tree since they never concealed their true intentions.

Before the court addresses the substance of these arguments, we pause to comment about Green Tree's objection at trial that evidence regarding the Letts' intentions in entering into the contract with Serenity Homes and Green Tree should be excluded by the parol evidence rule. The Court overruled the objection at

5. Paragraph 8 of the Retail Installment Contract between the Letts and Serenity Homes/ Green Tree provides it pertinent part:

PROTECTION OF THE MANUFACTURED HOME: I will: … (c) not move, use illegally, sell, lease or otherwise transfer the Manufactured Home; (d) not attach the Manufactured Home to any real estate and the Manufactured Home will always be treated as personal property unless you (Green Tree) consent in writing and state law permits such contrary treatment …

6. The Letts contend and Green Tree "admits" that the affixation of the mobile home to the land somehow destroyed Green Tree's security interest. The Court disagrees with the parties' assessment of the validity of the security interest, although it does not affect our analysis of this issue or the holdings in this case. Conversion of personal property to real estate only affects the *priority* of a security interest vis-a-vis third parties (*e.g.,* lienors or mortgage holders) but has no effect on the *validity* of the security interest. Mo.Rev.Stat. § 400.9-313 (1994). *See Lee's Mobile Homes, Inc. v. Grogan,* 621 S.W.2d 317, 319 n. 4 (Mo.Ct. App.1981); *see also, Waters v. Union Bank of Repton,* 370 So.2d 957, 960–61 (Ala.1979); *Hartford National Bank and Trust Co. v. Godin,* 137 Vt. 39, 398 A.2d 286, 287 (1979). *Cf. Avco Financial Services v. Anderson,* 199 B.R. 52, 53 (Bankr.E.D.Mo.1996).

7. It has not been established that Serenity Homes was an agent of Green Tree, but this fact is unnecessary to the Court's ruling.

trial and briefly restates its reasons for doing so here.

■ The parol evidence rule states:

When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence whether parol or otherwise, of antecedent understandings and negotiations will not be admitted *for the purpose of varying or contradicting the writing.*

CORBIN ON CONTRACTS, § 573 at 357 (1960) (emphasis added).

■ Quite simply, the rule is inapplicable to the purpose for which the evidence was admitted in this case. The evidence was not introduced for the purpose of varying or contradicting the writing; rather, it was admitted solely for the purpose of shedding light on the Letts' state of mind when they signed the contract and obtained an extension of credit from Green Tree. In other words, it was admitted to answer the question, "Did the Letts have the intent to deceive Green Tree when they took those actions?" This is a much different question than what were the terms of the contract or whether the Letts breached that contract. There is no doubt that the Letts' treatment of Green Tree's collateral constitutes a breach of the contract. However, that is not the issue at hand.

The evidence adduced at trial regarding the Letts' state of mind at the time they obtained financing from Green Tree indicates that they did not have the intent to deceive, and therefore did not defraud Green Tree within the scope of § 523(a)(2)(A). The Court need not address whether Green Tree met the other elements of a § 523(a)(2)(A) claim because, as stated above, in order to prevail under § 523(a)(2)(A), a creditor must prove, by a preponderance of the evidence, *all* of the elements. Consequently, failure to prove any one of the elements defeats the entire claim.

■ In order to prevail under § 523(a)(2)(A), a creditor must prove, *inter alia*, that the debtor, "made them [false representations] with the intention and purpose of deceiving the creditor ..." [8] The intent element is derived from the requirement under § 523(a)(2)(A) that a creditor must prove actual fraud; fraud implied in law is insufficient. *In re Ophaug*, 827 F.2d at 341 n. 1. *See American Title Insurance Company v. Gramolino (In re Gramolino)*, 183 B.R. 565, 567–68 (Bankr.E.D.Mo.1995) (citing *Ophaug*). Stated in other terms, it must be determined that the debtor subjectively intended to deceive the creditor, rather than inferred that a debtor had the requisite intent because he or she made a representation that a reasonable person would have known was false and the creditor was, in fact, deceived by the representation. *Chase Manhattan Bank v. Murphy (In re Murphy)*, 190 B.R. 327, 332–333 (Bankr. N.D.Ill.1995). Because it is often difficult to ascertain a debtor's subjective intent, courts frequently rely on circumstantial evidence or inferences drawn from a course of conduct to determine whether the debtor had the intent to deceive. The most frequently used technique to determine whether a debtor had the requisite intent is to compare the debtor's conduct to a "list" of factors or badges of fraud— the more factors that are satisfied the more likely the court will find an intent to deceive. In this case, because we find the Debtors' testimony credible as to their intent before and at the time they purchased the mobile home, we have no need to resort to such a list.

■ The Court finds it highly unlikely that at the time the Debtors obtained financing from Green Tree, they intended anything beyond simply purchasing the mobile home and altering it to fit their

---

8. Element number 3 in the list above. *See In re Pickett; Thul v. Ophaug (In re Ophaug); Field v. Mans; Green Tree Financial Corp. v. Beasley (In re Beasley), supra.*

needs. It was only much later that the Debtors learned that, by altering the mobile home and placing it on a permanent foundation, they had undermined Green Tree's security interest. A later formation of the intent to deceive is insufficient to establish actual fraud; borrowing terminology from criminal law, the *mens rea* must be concurrent with the *actus reus.* *See* 22 C.J.S. *Criminal Law* § 31 at 35–36 (1989). For example, if a person mistakenly takes someone else's coat from a coat rack but later decides to keep it, he will not have committed larceny; the intent, or *mens rea,* to steal will have been separate from the *actus reus* of taking and transporting the property of another. Similarly, because the Debtors did not intend to defraud Green Tree at the time they converted the mobile home from personal property to real estate, they did not commit actual fraud. The evidence adduced at trial might have supported a case of fraud implied in fact, but it does not support an allegation of actual fraud, and that is what is required to establish a claim under § 523(a)(2)(A).

In addition, if the Court determined that the Letts had actually communicated to Serenity Homes their intent to affix the mobile home, it would only strengthen the Court's conclusion that they did not have the intent to deceive at the time they obtained credit from Green Tree. The evidence is contradictory as to whether the Letts communicated their intentions of altering the mobile home and affixing it to real estate to the salesman at Serenity Homes, but considering the extent to which they altered the physical construction of the mobile home, the Court finds it hard to believe that Lett could have done all that work without inquiring whether such alterations could be made or, at least, mentioning his plans to the dealer.

In sum, the Court concludes that the evidence does not support a finding that the Debtors intended to deceive Green Tree at the time they obtained an extension of credit, and therefore did not commit actual fraud under § 523(a)(2)(A). Accordingly, the Court denies relief on Count I of Green Tree's Complaint.

### b. Green Tree's Complaint—Count II

Count II of Green Tree's complaint fails for reasons similar to those noted in the discussion of Green Tree's Count I.[9] In Count II of its Complaint, Green Tree argues that the Debtors should be denied discharge under § 523(a)(2)(A) because the debtors committed fraud by failing to disclose Green Tree's security interest in the mobile home at the closing of the Letts' sale of the mobile home and Missouri real property to the Boshears on March 25, 1998, and by keeping the proceeds from the sale without disbursing any funds to Green Tree. The Debtors counter that they were under no duty to disclose the existence of Green Tree's security interest or to disburse any funds to Green Tree out of the sale of the mobile home because Green Tree's lien had effectively been extinguished, or so they believed, when they affixed the mobile home to their land.

The Court finds that the Debtors' characterization of Green Tree's security interest does defeat Green Tree's claim under § 523(a)(2)(A), but not for the reasons the Debtors have stated since, as mentioned above,[10] it is unlikely that the Debtors' actions did, in fact, extinguish Green Tree's security interest. More important than whether Green Tree's interest was actually destroyed is what the Debtors subjectively believed the status of Green Tree's interest was at the time they signed the closing affidavit and made the

9. For the sake of brevity, the Court confines its discussion to the most salient issues in Count II. The decision not to address the other elements required under § 523(a)(2)(A) should not be taken as a statement that Green Tree has or has not met its burden in regard to them.

10. *See supra* note 6.

representation that there were no known, outstanding security interests.

The second element of actual fraud requires that the Debtors *knew* their representations to be false at the time they were made. *In re Pickett,* 234 B.R. at 753. In addition to actual knowledge of the falsity, this requirement has been interpreted to include a "reckless disregard for truth or falsity of a statement." *Id.; In re Gramolino,* 183 B.R. at 566–67. Whichever test is applied in this case, however, the Court finds that the Debtors did not have the requisite knowledge of the falsity to support a § 523(a)(2)(A) claim.

The evidence adduced at trial and the deposition of Christopher Lett show that at the time the Debtors signed the affidavit they believed Green Tree no longer had a valid security interest in the mobile home. Apparently, Christopher Lett was advised by Cynthia Campbell that his affixation of the mobile home to the land invalidated Green Tree's security interest and that he "didn't need to worry about it." Although Christopher Lett's subsequent use of this information was not entirely honorable, to say the least, the fact that he had been given this information, especially by someone he regarded as his legal advisor, removes the possibility that he had actual knowledge of the falsity of his representations or that he was displaying a reckless disregard of the truth.

In sum, the Court concludes that the evidence does not support a finding that the Letts knew the representations they made at the closing were false, and therefore did not commit actual fraud under § 523(a)(2)(A). Accordingly, the Court denies relief on Count II of Green Tree's Complaint.

**11.** The only substantive difference between First American's original Complaint and its proposed First Amended Complaint is the addition of 11 U.S.C. § 523(a)(6) as a basis for a determination of nondischargeability. The Court addresses the issue of whether 11

*c. First American's Complaint—Count I*

In Count I of their original Complaint,[11] First American argues that, pursuant to 11 U.S.C. § 523(a)(2)(A), the $76,041.41 owed to it should be declared nondischargeable because the Debtors obtained that money from First American through actual fraud.[12] For the reasons stated below, the Court finds that First American has satisfied all of the elements necessary to establish a claim under § 523(a)(2)(A) and declares the debt nondischargeable.

*(1) The Debtors made representations.*

The Debtors made representations in two respects. The Debtors made affirmative representations that there were no unpaid or unrecorded mortgages when they signed the affidavit at the closing of the Lett–Boshears sale, and the Debtors' silence as to the existence of the Southwest Missouri Bank mortgage also constitutes a representation. *Caspers v. VanHorne,* 823 F.2d 1285, 1288 (8th Cir.1987) ("Bankruptcy courts have overwhelmingly held that a debtor's silence regarding a material fact can constitute a false representation actionable under section 523(a)(2)(A).") (citing *In re Jenkins,* 61 B.R. 30, 40 (Bankr.D.N.D.1986); *Matter of Weinstein,* 31 B.R. 804, 809 (Bankr. E.D.N.Y.1983); *In re Maier,* 38 B.R. 231, 233 (Bankr.D.Minn.1984); *In re Frye,* 48 B.R. 422, 426 (Bankr.M.D.Ala.1985); *In re Samford,* 39 B.R. 423, 427 (Bankr. M.D.Tenn.1984); *Matter of Cheatham,* 44 B.R. 4, 8 (Bankr.N.D.Ala.1984); *H.C. Prange Co. v. Schnore,* 13 B.R. 249, 252–254 (Bankr.W.D.Wis.1981)), *overruled on different grounds by Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

U.S.C. § 523(a)(6) is properly before the Court in the next section.

**12.** First American has standing to bring this claim as an assignee of Southwest Missouri Bank's note and Deed of Trust.

**(2) At the time, the Debtors knew the representations were false.**

There is overwhelming evidence that Christopher Lett knew that Southwest Missouri Bank had a valid mortgage on Tract No. 2 of his property when he signed the affidavit saying that there were no unpaid or unrecorded mortgages on the property being sold. Christopher Lett testified that he only requested a release of Tract No. 1, and before being advised by Cynthia Campbell, probably believed that the Deed of Release (Partial) obtained in order to sell Tract No. 1 to Perry only covered Tract No. 1. Nearly a year earlier, he had had a survey made to divide the original parcel into two tracts and had had an appraisal made of the tract the Letts were retaining, both for the express purpose of permitting them to sell part of the land and allowing the bank to have a continuing security interest on the tract the Letts were retaining. By his own testimony, Lett admitted that he knew that the Deed of Release (Partial) improperly described the tract of land that was supposed to be released and that a "mistake" had been made by Hawkins Title in failing to discover the error. But Lett kept this information to himself at the closing, even when he was asked directly, via the affidavit, if he knew of any unpaid or unrecorded mortgages.[13] The fact that Lett testified that he was aware that Hawkins Title had made a "mistake," and called it such, reinforces the conclusion that Christopher Lett *knew* that the representations he made at closing (both affirmative and silent) were false.

**(3) The Debtors made the representations with the intention and purpose of deceiving First American.**

As discussed previously, actual fraud under § 523(a)(2)(A) requires a showing that a debtor had the subjective intent to deceive, and the Court is convinced that the Debtors, at least Christopher Lett, did not disclose the existence of Southwest Missouri Bank's mortgage at the closing with the intent and purpose of deceiving Southwest Missouri Bank and First American: Lett signed the affidavit and did not bring Hawkins Title's mistake to anyone's attention in order to close the sale and receive all of the proceeds; he converted the proceeds into exempt property (a homestead in Kansas); and he then declared bankruptcy so that the loss would ultimately fall on someone else. Lett made numerous statements, at trial and at his deposition, that leave little doubt that this was his intent. In his deposition Lett admitted that he was sorry that Hawkins Title was involved in the loss and that he wished he "could have hung it on Abbey Title," indicating that he intended to deceive, or "hang it," on someone. Moreover, at trial, Lett testified that there was "some truth" to the statement that he never told anyone about the mistakes on the released Deed of Trust and the Green Tree lien so he could sell his property and leave Missouri. Even a "little truth" is enough to substantiate a finding that Lett had the intent to deceive.

**(4) First American relied on the Letts' representations.**

The degree of reliance necessary under § 523(a)(2)(A) is, as First American correctly points out in its post-trial brief, what is called "justifiable" reliance. The Supreme Court determined in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), that justifiable reliance, rather than reasonable reliance, was the appropriate standard to be applied

---

**13.** At trial, both First American and Lett referred to Southwest Missouri Bank's mortgage on Tract No. 2 as an unrecorded mortgage. The Court believes that "unpaid" mortgage would be a better description since it was still recorded, even though the Deed of Release (Partial) was somewhat ambiguous.

This does not affect the result, however; the affidavit also required the disclosure of unpaid mortgages—satisfying the falsity requirement—and the fact that Lett thought it was an unrecorded mortgage and the affidavit required the disclosure of such satisfies the intent requirement.

under § 523(a)(2)(A).[14] Justifiable reliance is a less demanding standard than reasonable reliance and is derived primarily from the common law requirement for fraudulent misrepresentation as explicated in the Restatement (Second) of Torts. *Mans,* 516 U.S. at 69–77, 116 S.Ct. at 443–46. Quoting from the Restatement (Second) of Torts, the Supreme Court explained: "[T]he plaintiff's reliance on the misrepresentation must be justifiable ... [T]his does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Mans,* 516 U.S. at 70–71, 116 S.Ct. 437, 444 (quoting RESTATEMENT (SECOND) OF TORTS, § 545A, comment b.). In addition to the subjective element of the standard, justifiable reliance is a less demanding standard; it is based on the common law rule that a victim's contributory negligence is not a defense to an intentional tort. *Sanford Institution for Savings v. Gallo,* 156 F.3d 71, 74 (1st Cir.1998). For example, the justifiable reliance standard does not require an investigation, "although he [a victim] might have ascertained the falsity of the representation had he made an investigation," *Mans,* 116 S.Ct. at 444, even though a failure to do so would be considered negligent, "unless he has discovered something that would serve as a warning that he is being deceived." *Id.* (citations omitted). Applying this standard, the Court finds that First American justifiably relied on the Letts' representations at closing that there were no unpaid mortgages.

The Debtors' argument in response, as the Court understands it, is that there was no justifiable reliance by First American (via Hawkins Title) because (1) Hawkins didn't rely on the Letts' affidavit because it conducted its own title search, and (2) whatever reliance there was was not justifiable because Hawkins was negligent in its search. The Court is not swayed by either of these arguments, although the second argument does raise a closer question.

The Court believes that the Debtors' first argument is flawed because it is predicated on a view of the title insurance requirements that is too narrow, *i.e.* that the title search and closing affidavit are independent from each other and that the satisfaction of one is all that is required. The evidence and testimony adduced at trial do not support the Debtors' interpretation. Both Corrine Hawkins and Deborah Gould testified that if the Debtors had not signed the affidavit, the closing would have been stopped right then, regardless of a "clean" title report. Conversely, even if the Debtors had signed the affidavit, there is no question that Hawkins would not have completed the closing and issued title insurance without a title search and a report of good title. The closing affidavit and title search were both integral requirements for a closing and issuance of title insurance, and Hawkins (and First American) relied on both. Therefore, reliance has been established.

As for the justifiability of the reliance, Hawkins' conduct in this matter is similar to the hypothetical situation often invoked to help define justifiable reliance—

Significantly for our purposes [and the Court's purposes in this case], the illustration is given of a seller of land who says it is free of encumbrances; according to the Restatement, a buyer's reliance is justifiable, even if he could have 'walk[ed] across the street to the office of the register of deeds in the courthouse' and easily have learned of an unsatisfied mortgage.... The point is

14. Other courts had applied this standard prior to the ruling in *Mans, (see e.g., Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh),* 973 F.2d 1454, 1458

(1992)), but now the standard, at least in name, is applied uniformly in all § 523(a)(2)(A) cases.

... that contributory negligence is no bar to recovery because fraudulent misrepresentation is an intentional tort.

*Mans*, 516 U.S. at 70, 116 S.Ct. at 444 (citations omitted); *see Griffith, Strickler, Lerman, Solymos & Calkins v. Taylor (In re Taylor)*, 195 B.R. 624, 628 (Bankr. M.D.Pa.1996); *Nissan Motor Acceptance Corp. v. Ferrell (In re Ferrell)*, 213 B.R. 680, 685 (Bankr.N.D.Ohio 1996). And the present case is almost exactly the situation in *Rainier Title Company, Inc. v. Demarest (In re Demarest)*, 176 B.R. 917 (Bankr. W.D.Wash.1995). In *Demarest*, the court held that a title insurer's negligence did not preclude a finding that insurer's reliance on sellers' silence regarding the existence of unpaid mortgage was justifiable. *Id.*

The Court finds that although the failure of Hawkins Title to pick up a phone and call Southwest Missouri Bank to make a simple inquiry about the Deed of Release (Partial) strains the credulity of a *reasonable* person, the standard under § 523(a)(2)(A) is not reasonable reliance, but justifiable reliance, which tolerates such unreasonable and even negligent behavior. The Court does note, however, that Hawkins Title's conduct under these circumstances lies on the outer fringes of what can be considered justifiable.

> (5) *First American sustained a loss and damage as the proximate result of the representations having been made.*

The evidence clearly shows that First American has a loss of $76,041.41 and that this loss was proximately related to the fraudulent acts of the Debtors.

For the above reasons, the Court will grant First American the relief requested in Count I of its Complaint, including an award of reasonable attorneys' fees in the amount of $25,000.00.[15]

## 2. § 523(a)(6)

As a matter preliminary to the Court's discussion of Green Tree's and First American's claims of nondischargeability under 11 U.S.C. § 523(a)(6), we briefly address the propriety of our consideration of § 523(a)(6) in light of the fact that none of the parties raised the issue in pre-trial pleadings.

■ Both the Court, on its own initiative,[16] and plaintiff First American, have invoked Rule 15 to amend the pleadings to conform to the evidence adduced at trial, so as to include claims under § 523(a)(6). The Court announced at the close of the plaintiffs' cases, off the record in a meeting with all of the parties and in open court, that it considered that § 523(a)(6) had been tried by the implied consent of the parties and would deem the pleadings amended to include claims under § 523(a)(6).[17] On July 14, 1998, the same day it submitted its post-trial brief, First American filed a Motion for Leave to File First Amended Complaint accompanied by First American's proposed First Amended Complaint. The substance of First American's proposed amendment is the inclusion of 11 U.S.C. § 523(a)(6) as an additional

---

**15.** At trial, First American submitted evidence of attorneys' fees in excess of $38,000.00. However, because First American only requested $25,000.00 in its First Amended Complaint, and because the Court believes that any amount over $25,000 would not be reasonable, we will only grant attorneys' fees to the extent of $25,000.00. The Court notes, though, that $25,000.00 lies at the outer bounds of reasonableness.

**16.** It is within the discretion of the Court to enlarge the pleadings, *sua sponte. See Ehrichs v. Kearney*, 730 F.2d 1170, 1174 (8th Cir. en banc 1984) ("... a court may grant recovery on a theory not pled but fairly tried by both parties."); *Hibernia National Bank v. Perez, III*, 124 B.R. 704, 707 (E.D.La.1991).

**17.** Although express consent is not required by Rule 15(b), all of the parties appeared to give express consent to the Court's consideration of § 523(a)(6) as a basis for nondischargeability at a meeting held off the record in chambers prior to the Court's announcement in open court of its intention to consider the issue.

ground for nondischargeability, and First American cites Rule 15(b) in support of its Motion for leave to amend.

The amendment of pleadings to include new legal claims is controlled by Federal Rule of Civil Procedure 15.[18] Rule 15 provides, in pertinent part:

(b) Amendments to Conform to the Evidence. *When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.* Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Fed.R.Civ.P. 15(b) (emphasis added).

 "Implied consent is found where the parties recognized that the issue entered the case at trial and acquiesced in the introduction of evidence on that issue without objection." *Hardin v. Manitowoc–Forsythe Corp.*, 691 F.2d 449, 456 (10th Cir.1982); *Missouri Housing Development Commission v. Brice, Jr.*, 919 F.2d 1306, 1316 (8th Cir.1990) (citing 6A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, § 1493 at 19 (2d

ed.1990)). 11 U.S.C. § 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity," and significant evidence was introduced at trial without objection regarding conduct of the Debtors that injured Green Tree and First American and regarding the Debtors' intent when those actions were taken.[19] Moreover, most of the evidence concerning Lett's intentions at the time of closing was introduced, without objection, on the second day of trial, after counsel for the Debtors was already on notice that the Court was considering § 523(a)(6) as a basis for nondischargeability, and the Debtors have not made any suggestion in their post-trial briefs that they object to the consideration of § 523(a)(6). Therefore, the Court concludes that it may consider § 523(a)(6) as a basis for excepting the debts owed to Green Tree and First American from discharge and grants First American's Motion for Leave to Amend its Complaint accordingly.

Having concluded that § 523(a)(6) is properly before the Court, the Court now turns to a discussion of the Debtors' conduct involving Green Tree and First American. We begin with a brief overview of the elements necessary to establish a claim under § 523(a)(6).

Section § 523(a)(6) of the Bankruptcy Code provides that:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

\*　　\*　　\*　　\*　　\*　　\*

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6).

 The Supreme Court recently addressed the issue of what conduct consti-

---

**18.** FRCP 15(b) applies to bankruptcy proceedings via Federal Rule of Bankruptcy Procedure 7015(b).

**19.** In all practicality, it probably would have been difficult for the Debtors to object to the

introduction of evidence that would support a § 523(a)(6) claim since the elements of intent, injury and proximate cause are the same for §§ 523(a)(2) and (a)(6); the only difference is a matter of degree.

tutes "willful and malicious" in *Kawaau-hau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) *aff'g, Geiger v. Kawaauhau (In re Geiger)*, 113 F.3d 848 (8th Cir.1997). The Supreme Court echoed the Eighth Circuit Court of Appeals' interpretation that "[i]t is necessary that it [a § 523(a)(6) action] be based on the commission of an intentional tort," *In re Geiger*, 113 F.3d at 853, and stated that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, nor merely a deliberate or intentional act that leads to injury ... Negligent or reckless acts ... do not suffice to establish that a resulting injury is 'willful and malicious.'" *Kawaauhau*, 523 U.S. at 61–64, 118 S.Ct. at 977–78. The intentional tort implicated in this case is conversion, although it has not been specifically pleaded by the plaintiffs.

 Conversion is the "unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights." *Dayton Construction, Inc. v. Meinhardt*, 882 S.W.2d 206, 208 (Mo.Ct.App.1994). It can be proved in three ways: 1) by tortious taking; 2) by any use or appropriation to the use of the person in possession, indicating a claim of right in opposition to the owner's rights; or 3) by refusal to give up possession to the owner on demand, even though the defendant's original possession of the property was proper. *Collins v. Trammell*, 911 S.W.2d 635, 637 (Mo.Ct. App.1995). The Debtors' conduct here falls under the second category inasmuch as the Debtors appropriated the proceeds of sale as their own instead of paying them over to the secured creditors.

 The simple act of conversion, however, may not be sufficient to establish a § 523(a)(6) claim. In *Barclays American/Business Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 879 (8th Cir.1985), the Eighth Circuit Court of Appeals commented that "a conversion of property (a simple interference with legal rights) is not

enough in itself to prevent discharge of a debt," *id.* at 879, and formulated the following two-part test to determine whether a conversion, specifically a transfer in breach of a security agreement, constitutes a willful and malicious injury under § 523(a)(6): "The conduct must be (1) headstrong and knowing ('willful') and, (2) targeted at the creditor ('malicious'), in the sense that the conduct is certain or almost certain to cause financial harm." *Id.* at 881; *see United States of America v. Foust (In re Foust)*, 52 F.3d 766, 768 (8th Cir.1995) (citing *In re Long, supra.*). Because this test remains the law in this circuit, is consistent with the holding in *Kawaauhau*, and provides a workable standard, we apply it here.

Under the *Long* test, the Court finds that the debts owed to Green Tree and First American are both nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

a. Green Tree

 Unlike Green Tree's § 523(a)(2)(A) claim, which required a showing of actual fraud—an intentional tort that is very time sensitive in that the intent and act (*"mens rea"* and *"actus reus"*) must be simultaneous—the act of conversion does not appear to have narrow temporal limitations. *See* 18 Am.Jur.2d, *Conversion* § 4 at 149 (1985) ("Conversion is a continuing tort, lasting as long as the person entitled to the use and possession of his property is deprived of it."). Consequently, the impediments to Green Tree's establishing a claim under § 523(a)(2)(A), *i.e.* the Debtors' lack of the requisite intent to defraud *at the time* they obtained credit from Green Tree and the Debtors' lack of knowledge that the representations were false *at the time* they signed the closing affidavit, do not impede the Court from finding that the Debtors' course of conduct, when considered in its entirety, constituted an unauthorized assumption of the right of ownership over Green Tree's property that was headstrong, knowing, and targeted at the creditor Green Tree.

At trial, Lett admitted all of the elements necessary to establish a claim of conversion that would satisfy the requirements of § 523(a)(6). Lett testified: (1) that he had granted Green Tree a security interest in the mobile home (*the property of another*); (2) that he affixed the mobile home to real estate and sold the mobile home without informing the buyers or Hawkins Title of Green Tree's interest and without informing Green Tree of the affixation or the sale (*the unauthorized assumption of the right of ownership*); and (3) that he intended to convert the proceeds from the sale to exempt property and took this course of action with the knowledge that Green Tree would directly suffer as a result (*headstrong, knowing, and targeted at the creditor*).

Throughout these proceedings, Lett has maintained that because he "innocently" converted the mobile home from personal property to real estate and then later learned that Green Tree's lien had been (supposedly) extinguished, he was under "no duty" to disclose Green Tree's interest or pay Green Tree from the proceeds of the sale of the mobile home, and therefore is free of blame or liability. And while this unique sequence of events prevents the Court from finding that Lett committed fraud, we find Lett far from blameless. Once Lett was erroneously informed that he had "extinguished" Green Tree's lien, he was not entitled to use this perceived "fortunate" change in circumstances to his advantage and Green Tree's harm. On the contrary, contractually, he was under a duty to inform Green Tree that he had changed the character of the mobile home, and, in a sense, statutorily (by § 523(a)(6)) he was obligated to not use this change in circumstance to cheat Green Tree out of its money through the bankruptcy process.

For the foregoing reasons, the Court finds that the $27,296.25 debt owed to Green Tree is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

b. First American

■ The evidence in this case clearly supports a finding that the Debtors' choice to take advantage of Southwest Missouri Bank's and Hawkins Title's mistakes regarding the mortgage on Tract No. 2 of the Missouri property and abscond with the proceeds from the sale of the mortgaged property constitutes both a conversion of property and a knowing and headstrong injury targeted at a specific creditor.

Once again, Lett cannot hide behind the circumstances that made it possible for him to keep money that was not rightfully his. First of all, he knew that the Deed of Release (Partial) was only supposed to cover Tract No. 1; that was all Lett requested and all the bank intended to release. Just because a mistake had been made in discovering the outstanding mortgage did not mean that the mortgage magically disappeared or that the Letts were no longer obligated to pay Southwest Missouri Bank the money it had loaned to the Letts. To the extent of the outstanding balance on Southwest Missouri Bank's note, $76,041.41, the Court concludes that the Letts converted property of First American (as assignee of Southwest Missouri Bank's claim).

Second, the fact that Hawkins made a mistake did not absolve Lett of the duty to disclose a material fact, *i.e.*, the existence of Southwest Missouri Bank's mortgage. The Debtors' argument that they had no duty to speak because "[a] claim for fraudulent omission which alleges one party withheld information based on superior knowledge requires the plaintiff to show that he exercised due diligence to discover the information" is without merit, and frankly, disingenuous. Regardless of whether there was a fraudulent omission, the Debtors made affirmative representations that there were no outstanding mortgages, and no amount of negligence on the part of Hawkins would affect the Letts' culpability for lying in the affidavit. Furthermore, the legal principles cited by the

Debtors do not apply where the silent party knows that the other party is proceeding under a mistake and, under the circumstances, would be expected to disclose the truth. *See Eckholt v. American Business Information, Inc.,* 873 F.Supp. 510, 520 (D.Kan.1994).

Finally, we return to Lett's admission that he was sorry Hawkins suffered a loss and that he would have rather "hung it" on a different title company. It is hard to conceive of a more telling statement that Lett's conduct was willful, headstrong and targeted at a creditor. That Lett admitted his intent to harm a different title company is irrelevant; the creditor that was actually being targeted was Southwest Missouri Bank, and whichever title company issued the policy on the Boshears' title (although it is unlikely that another company would make the same mistake as Hawkins) would succeed to the claim as an assignee of Southwest Missouri Bank's claim, as First American ultimately did.

For the foregoing reasons, the Court finds that the $76,041.41 debt owed to First American is nondischargeable pursuant to 11 U.S.C. § 523(a)(6) and grants First American the relief requested in Count I of its First Amended Complaint accordingly.

*3. § 727(a)(2)*

■ In Count II of its complaint, First American requests that the Court deny the Debtors' discharge pursuant to 11 U.S.C. § 727(a)(2)(A). Objections to discharge must be proved by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). § 727(a)(2)(A) provides:

(a) The court shall grant the debtor a discharge, unless—

\* \* \* \* \* \*

(2) the debtor, with intent to hinder, delay, or defraud a creditor ... has transferred, removed, ...

(A) property of the debtor, within one year before the date of the filing of the petition.

11 U.S.C. § 727(a)(2)(A).

For the reasons stated below, the Court finds that First American has satisfied its burden in regards to all of the elements of § 727(a)(2)(A) and will deny the Debtors' discharge accordingly.

■ Having already concluded in our discussion of First American's § 523(a)(2)(A) claim that the Debtors had the intent to defraud, we address that element of § 727(a)(2)(A) only briefly. For purposes of our § 523(a)(2)(A) inquiry, we determined that the Debtors obtained property from creditor First American with the intent to defraud. The property obtained was the proceeds from the sale of the Debtors' Missouri real estate on which Southwest Missouri Bank held a valid mortgage. For the purposes of our discussion of First American's § 727(a)(2)(A) claim, we look to the flipside of this transaction, i.e. the sale of Missouri real estate (*property of the debtor*) to the Boshears on March 25, 1998, which was within one year of the bankruptcy and, as we have previously determined, done with the intent to defraud a creditor.

Section 727(a)(2)(A) is generally only invoked to protect unsecured creditors. *See, e.g., Cape County Bank v. Lane (In re Lane),* 166 B.R. 133, 138–39 (Bankr. E.D.Mo.1993) (listing cites of cases holding similarly). The interpretation of § 727(a)(2)(A) that confines its application to the protection of unsecured creditors (as opposed to fully secured creditors) arises from the "property of the debtor" language in § 727(a)(2), inasmuch as this language has been interpreted as requiring property that is not fully encumbered. *Id.* In this case, however, even though the § 727(a)(2)(A) claim is being advanced by a fully secured creditor, because there was substantial potential equity in the Missouri

real estate, the § 727(a)(2)(A) claim is well taken.[20]

According to the appraisal made in 1997 for the release of Tract 1, the Debtors' property had a value of $120,000.00, and Southwest Missouri Bank was secured only to the extent of $76,041.41, thereby leaving $43,958.59 in equity. Adding Green Tree's claim to the equation doesn't alter the result since Green Tree's claim would probably be superceded by a good faith purchaser, inasmuch as it didn't record its security interest in the real estate records. But even subtracting Green Tree's claim of $27,296.25, there would have been $16,662.34 in equity (minus the Debtors' $8,000.00 homestead exemption, if claimed) available for distribution to the unsecured creditors. Considering these circumstances, the conclusion that the Debtors sold their property in an attempt to deprive the unsecured creditors of whatever possible equity was in the Missouri real estate is inescapable. *See Chillicothe State Bank v. Carroll (In re Carroll)*, 70 B.R. 143 (Bankr.W.D.Mo.1986).

For the foregoing reasons, the Court finds that the Debtors should be denied discharge pursuant to § 727(a)(2)(A) because they sold property (of the Debtors) within one year of the filing of bankruptcy, with the intent to defraud creditors, and the Court grants the relief requested in Count II of First American's Complaint accordingly.

### 4. *The Validity of the Kansas District Court Judgment*

In Count IV of its Complaint, First American asks the Court to validate a post-petition judgment entered in favor of First American and against the Debtors by the United States District Court for the District of Kansas. That judgment ("the Kansas judgment") awarded First American $76,041.41 in monetary damages, plus interest, attorneys' fees and costs, and ordered that a constructive trust be imposed on the Debtors' Kansas real estate. In response, the Debtors have pleaded and argued that the Kansas judgment was obtained in violation of the § 362 automatic stay and is therefore null and void.

We briefly summarize the factual background for this issue. On July 16, 1998, First American filed a Complaint against the Debtors in the U.S. District Court in Kansas seeking monetary damages on the same grounds asserted in these proceedings and requesting the District Court to impose a constructive trust on the Debtors' Kansas real estate. The Debtors failed to file a responsive pleading and on September 1, 1998, First American filed a Motion for Default Judgment. Two days later, on September 3, the Debtors filed their Chapter 7 bankruptcy petition in this Court. Neither First American nor the Debtors advised the District Court of the bankruptcy filing, and on September 24, 1998, some 21 days after the bankruptcy was filed, the District Court entered its judgment.

First American did not obtain relief from the automatic stay to proceed with the Kansas action and, in fact, has never asked this Court to lift the automatic stay with respect to that proceeding. Despite that failing, First American argues that the Kansas judgment is at best voidable, not void, and that this Court should, in effect, "validate" the Kansas judgment because First American took no affirmative steps after the § 362 stay went into effect to cause that judgment to be entered.

This brings the Court to the oft-debated question of whether an action taken in violation of the § 362 stay is void or voidable, and with no small amount of trepidation, we will follow the many other courts that have dared to venture into this semantic quicksand.

---

**20.** The statute does not give any indication whether the intent to defraud must also be directed at unsecured creditors, but the fact that Lett believed that Green Tree's lien was extinguished and that it had become an unsecured creditor is sufficient to establish the intent to deceive at least one unsecured creditor.

■ Section 362(a) of the Bankruptcy Code provides that a petition filed in bankruptcy "operates as a stay, applicable to all entities, of—"(1) the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was . . . commenced before the commencement of the case under this title [Title 11] . . ." and "(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;" and "(4) any act to create, perfect, or enforce any lien against property of the estate . . ." 11 U.S.C. § 362(a). The automatic stay is broad in scope and applies to almost every formal and informal action against a debtor or property of a debtor, except for the exceptions set out in § 362(b). *In re Eugene L. Pieper, P.C.,* 202 B.R. 294, 297 (Bankr.D.Neb.1996). As the Eighth Circuit said in *Farley v. Henson,* 2 F.3d 273 (8th Cir.1993):

> The purpose of the automatic stay is to give the debtor a breathing spell from his creditors in which he may attempt a repayment or reorganization plan . . . The automatic stay also protects creditors by averting a scramble for the debtor's assets and promoting instead an orderly liquidation procedure under which all creditors are treated equally.

*Id.* at 274 (citations and quotations omitted).

It appears that most courts have held that actions taken in violation of the automatic stay are void and without effect. A majority of the circuit courts and a majority of the district and bankruptcy courts in the Eighth Circuit have concluded that an act done in violation of the automatic stay is void *ab initio.* On the other hand, a minority of courts considering the issue has determined that an act in violation of the stay is either invalid or voidable, subject to being either voided or validated by the court on the basis of equitable considerations.[21] The Eighth Circuit Court of Appeals, perhaps wisely, has declined to address the "theoretical question" of whether a post-petition action taken without relief from the automatic stay is "voidable" or "void ab initio." *Riley v. United States,* 118 F.3d 1220, 1222 n. 1 (8th Cir. 1997).

■ This Court believes that the better reasoned and more logical interpretation of § 362(a) is that actions taken in violation of the automatic stay are voidable, and are subject to being either voided or validated by a bankruptcy court or some other court on the basis of equitable considerations.

First of all, § 362(a), in its most basic terms, *prohibits* creditors and other persons and entities from taking post-petition actions (or continuing with pre-petition actions) aimed at the debtor or the debtor's property. However, the statute does not state whether actions taken in violation of the stay are to be considered void or merely voidable. If Congress had intended for actions taken in violation of the stay to be void *ab initio,* as many courts have held, it could easily have said so in a single sentence, but it did not do so.[22] On a daily basis, many actions are taken that are in violation of the statutes, but that does not mean that those actions are void. Rather, they are subject to being undone or set aside, on one hand, or being upheld and validated, on the other hand, by court order, whether by injunction, an order granting relief, or some other means.

Secondly, and perhaps more importantly, Congress has given the bankruptcy courts the power to retroactively annul the automatic stay and thereby approve or

---

**21.** A tally of the courts and their positions is detailed in *Carpio v. Smith (In re Carpio),* 213 B.R. 744, 748–49 (Bank.W.D.Mo.1997), and so will not be repeated here. It should be noted that one of the bankruptcy courts in this district is in the majority camp and the other appears to be in the minority camp as described above.

**22.** For example: "All actions taken in violation of the provisions of this section shall be void *ab initio* and of no effect."

validate actions that have been taken in violation of the automatic stay. Section 362(d) provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, *such as by terminating, annulling, modifying, or conditioning such stay* —

11 U.S.C. § 362(d) (emphasis added).

By authorizing the courts to *annul* or *modify* the automatic stay retroactively, Congress has, in effect, said that actions taken in violation of the stay are *voidable* and not *void*.

■■■■■ By definition, something that is *void* is ineffectual, nugatory, and of no effect, and nothing can be done to cure it. *In re Oliver*, 38 B.R. 245, 247 (Bankr. D.Minn.1984). "[T]he term 'void' can only be properly applied to those [transactions] . . . that are of no effect whatsoever, mere nullities, . . . and therefore incapable of confirmation or ratification." *Haggart v. Wilczinski*, 143 F. 22, 27 (5th Cir.1906). However, something that is *voidable* may be avoided or declared void. The word describes a defective transaction or act that may be declared void or, conversely, cured by confirmation or ratification. *Oliver*, 38 B.R. at 247; *Dayton v. Nell*, 43 Minn. 246, 248, 45 N.W. 231, 232 (1890); BLACK'S LAW DICTIONARY, 1573–74 (6th ed.1990).

The Bankruptcy Code grants the court broad discretion in the formulation of appropriate relief from the automatic stay in individual cases by providing that the court may terminate, annul, modify, or condition the stay on an appropriate evidentiary showing. 11 U.S.C. § 362(d). The inclusion of "annulling" in the statute affording relief from the stay indicates an evident legislative intent to vest the bankruptcy court with the power to grant relief retroactively to the date of the bankruptcy filing and thereby cure or validate actions taken in violation of the statutory stay in certain instances.

*Kemper Insurance Company v. Profile Systems, Inc. (In re Profile Systems, Inc.)*, 193 B.R. 507, 511 (Bankr.D.Minn.1996) (citing *In re Siciliano*, 13 F.3d 748, 751 (3rd Cir.1994)).

Many of the courts holding that actions in violation of the stay are void rely to some extent on the Supreme Court's decision in *Kalb v. Feuerstein*, 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940). That case involved a post-petition judicial foreclosure sale of real property, in which the Supreme Court stated: "[T]he action of the Walworth County Court was not merely erroneous but was beyond its power, void, and subject to collateral attack." *Id.*, 60 S.Ct. at 346. At the time the Supreme Court decided *Kalb* in 1940, bankruptcy referees had the statutory power only to modify or terminate the automatic stay. The power to annul the stay, now contained in § 362(d), had not been given to the bankruptcy referees. Therefore, *Kalb* is distinguishable from the present case and this Court's conclusion as set out herein does not conflict with the Supreme Court's holding in *Kalb*. In fact, this Court believes that the Supreme Court's language, stating that the "void" action of the County Court was "subject to collateral attack," supports this Court's conclusion that stay violations are actually "voidable" and not "void." A completely void act, being incurable, could not, by definition, be "subject to collateral attack," as the Supreme Court suggests, because "subject to collateral attack" would mean that the act could be changed or perhaps "cured" of any illegalities.

■■■■■ By including in § 362(d) the power to *annul* or *modify* the automatic stay, Congress has implicitly recognized that actions taken in violation of the automatic stay are *voidable* rather than *void ab initio*. *Annul* means, among other things, to *make void* or of no effect, to nullify or do away with. "To annul a judgment or judicial proceeding is to deprive it of all force and operation, either *ab*

*initio* or prospectively as to future transactions." BLACK'S LAW DICTIONARY, 90 (6th ed.1990). "The word 'annulling' in this provision evidently contemplates the power of bankruptcy courts to grant relief from the stay which has retroactive effect; otherwise, its inclusion, next to 'terminating,' would be superfluous." *In re Tanksley,* 70 B.R. 429, 430 (Bankr.E.D.Mo.1987).

It is worthy of note that even those courts that hold that actions taken in violation of the automatic stay are void also recognize that there are "equitable exceptions" to that principle, and that the supposedly void action can nonetheless be altered or even approved retroactively on equitable grounds. *See e.g., In re Adams,* 215 B.R. 194, 195 (Bankr.W.D.Mo.1997) ("But, even if actions in violation of the stay are void, there are equitable exceptions to this rule."). *See also,* 3 COLLIER ON BANKRUPTCY ¶ 362.11[1] at pp. 362–115, 116 (15th ed. rev.1999). This lends support to this Court's conclusion that such actions are merely voidable, not absolutely void.

 While holding that actions taken in violation of the automatic stay are voidable, we also acknowledge that violations of the stay are to be taken seriously and not condoned or validated with impunity, inasmuch as the automatic stay is among the most basic of debtor protections under the Bankruptcy Code. *Soares v. Brockton Credit Union (In re Soares),* 107 F.3d 969, 975 (1st Cir.1997). If anything, the bias must be against giving retroactive approval to such violations, and then only upon a strong showing by the violator of the stay that such retroactive relief is appropriate. "Retroactive relief is not an automatic remedy or routinely granted in the ordinary course. On the contrary, retroactive relief is an extraordinary remedy and should generally be granted in only unique or compelling circumstances since the violator is essentially asking the court to exercise its power to balance the equities between the parties." *Profile Systems,* 193 B.R. at 512. *See also, Mataya v. Kissinger (In re Kissinger),* 72 F.3d 107,

109 (9th Cir.1995), and *In re Pulley,* 196 B.R. 502, 504 (Bankr.W.D.Ark.1996).

Although a court may use the annulment power to give retroactive relief from the stay, such relief should be granted sparingly. The breathing room provided by the stay would be limited if debtors feared regular retroactive validation. Debtors would be forced to defend all actions, even those stayed, because the stay might be retroactively annulled and a default by the debtor might become binding. Thus, retroactive relief should be granted only in extraordinary circumstances, such as when a creditor acted without knowledge of the stay, under circumstances in which relief from the stay would have been available, and where the creditor changed its position in reliance on the validity of its action.

3 COLLIER ON BANKRUPTCY § 362.11[1] at 362–116 (15th ed. rev.1999).

Some of the compelling circumstances considered by the courts in granting such extraordinary relief are: (1) if the creditor had actual or constructive knowledge of the bankruptcy filing and, therefore, of the stay; (2) if the debtor has acted in bad faith; (3) if there was equity in the property of the estate; (4) if the property was necessary for an effective reorganization; (5) if grounds for relief from the stay existed and a motion, if filed, would have been granted prior to the violation; (6) if failure to grant retroactive relief would cause unnecessary expense to the creditor; and (7) if the creditor has detrimentally changed its position on the basis of the action taken. *In re Adams,* 215 B.R. 194, 195–96 (Bankr.W.D.Mo.1997); *Soares,* 107 F.3d at 977; *Profile Systems,* 193 B.R. at 512; *Williams v. United Investment Corp. (In re Williams),* 124 B.R. 311, 316 (Bankr.C.D.Cal.1991). The Court finds that there are at least two other factors that should be considered, particularly under the facts of this case. One is whether the creditor took some affirmative action post-petition to bring about the violation of

the stay, such as filing motions or suggestions or the like. Another is whether the creditor promptly seeks a retroactive lifting of the stay and approval for the action that has been taken.

Turning to the present case, it is clear that the Kansas judgment, entered some 21 days after the bankruptcy filing without relief having been granted, was entered in violation of the automatic stay. *Matter of Holmes*, 52 B.R. 35, 36 (Bankr. W.D.Pa.1985); *Soares*, 107 F.3d 969. In some instances, courts have held that it was not a violation of the automatic stay for a court to enter a judgment against the debtors post-petition. Generally, those were cases in which the court had taken the case under advisement pre-petition or had entered its conclusions on the docket pre-petition and the judgment entered post-petition was simply the formal memorialization of that earlier entry, and the plaintiff-creditor had filed all of its motions or other actions pre-petition and had not taken any affirmative actions post-petition to cause the judgment to be entered. *Anderson v. Anderson (In re Anderson)*, 62 B.R. 448, 453 (Bankr.D.Minn.1986); *In re Teague*, 101 B.R. 57, 59 (Bankr. W.D.Ark.1989). These cases are inapposite from the present case. In this case, there is no evidence that the Kansas District Court had taken any action on the Motion for Default prior to the filing of the bankruptcy; in fact, it is likely that, under Rule 55, Fed.R.Civ.P., the District Court allowed the Debtors some period of time to respond to the Motion before taking any action on it. Because the Kansas judgment was entered post-petition, it was in violation of the automatic stay.

This, then, brings us to a consideration of whether there are, in this particular case, such extraordinary or compelling circumstances that would merit our granting retroactive relief to First American so as to give validity to the Kansas judgment. We conclude that such compelling circumstances do not exist and that First American's request to validate the Kansas judgment must be denied. Of the factors listed above for consideration, First American fails on almost all of them. First American knew of the bankruptcy filing before the Kansas judgment was entered,[23] there was substantial equity in the property on which First American sought the imposition of a constructive trust, the property would be essential to an effective reorganization if the Debtors were to seek to reorganize, a motion for relief would not have been granted by this court had First American sought relief prior to entry of the judgment, a failure to grant retroactive relief will not cause unnecessary expense to First American, and First American did not promptly seek retroactive relief from the stay to validate the judgment (and, in fact, has not specifically requested such retroactive relief even to this day). The only factor that favors First American—and which in all likelihood saves it from a contempt motion and sanctions—is that First American took no affirmative steps post-petition to cause the Kansas judgment to be entered; it filed its Motion for Default Judgment pre-petition and did nothing further.[24] Also, arguably, the Debtors had acted in bad faith by filing their bankruptcy petition in an attempt to shield their fraudulent property transactions from creditors.

**23.** The Debtors have suggested that First American had a duty to inform the Kansas District Court of the Debtors' bankruptcy filing and thereby prevent the entry of the judgment post-petition. First American counters that it had no such duty. The Court agrees with First American. In this Court's experience, it customarily has been the debtor who informed a court of the filing of a bankruptcy petition, so that a judgment would not be entered. A minimal amount of diligence by Debtors' counsel in this regard could have avoided this entire problem.

**24.** The Court does not need to decide the thorny question of whether the Kansas judgment was valid or invalid from September 24, 1998, until today, inasmuch as First American has taken no action to enforce the judgment.

For these reasons, the Court will deny First American the relief requested in Count IV of its Complaint and will not grant retroactive relief from the stay so as to validate the Kansas judgment. The judgment entered by the Kansas District Court is, accordingly, void and of no further effect.

### 5. Constructive Trust

In Count III of its Complaint, First American asks the Court to impose a constructive trust on the Kansas real estate, which it alleges, was purchased with moneys acquired through fraud from the sale of the Debtors' Missouri real estate to the Boshears. Whether the Court will impose a constructive trust depends on the resolution of two issues: (1) whether a bankruptcy court has the authority to impose a constructive trust in favor of a single creditor; and (2) whether the imposition of a constructive trust is warranted by the law of the situs of the proposed constructive trust "res." Because both of these issues can be answered in the affirmative, the Court will grant the relief requested in Count III and impose a constructive trust on the Kansas real estate in favor of First American.

a. The use of constructive trusts in bankruptcy.

The Circuits are divided on the issue of whether a bankruptcy court can impose a constructive trust. *See generally*, Andrew Kull, *Restitution in Bankruptcy: Reclamation and Constructive Trust*, 72 AM. BANKR.L.J. 265 (1998). Some courts have flatly rejected the use of constructive trusts in bankruptcy, to the point of stating that they are "anathema to the equities of bankruptcy." *See, e.g., XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443, 1452 (6th Cir.1994); *see also In re Stotler and Co.*, 144 B.R. 385, 387–388 (N.D.Ill.1992) (expressing reservations about using constructive trusts in bankruptcy) (citing *In re Behring International, Inc.*, 61 B.R. 896 (Bankr.N.D.Tex.

1986)). Other courts, including the Eighth Circuit Court of Appeals, have held that a bankruptcy court does have the power to impose constructive trusts. *See e.g., Chiu v. Wong*, 16 F.3d 306 (8th Cir.1994) (upholding constructive trust imposed on debtor's residence which had been purchased with embezzled funds); *Abramowitz v. Palmer*, 999 F.2d 1274 (8th Cir.1993) (upholding constructive trust imposed on homestead purchased with funds fraudulently obtained and directly traceable to plaintiff). *See also, O'Neal v. Southwest Missouri Bank of Carthage (In re Broadview Lumber Company, Inc.)*, 168 B.R. 941 (Bankr.W.D.Mo.1994) (willing to consider constructive trust remedy but refusing to impose one because state law elements had not been sufficiently proved); *In re Reider*, 177 B.R. 412, 424–416 (Bankr.D.Me.1994) (imposing constructive trust).

Objections to the use of constructive trusts in bankruptcy are based primarily on two grounds: (1) the constructive trust remedy, by nature, favors one creditor over all other creditors, and is antithetical to one of the fundamental goals of the bankruptcy process, *i.e.* the equitable distribution of the debtor's assets; and (2) there already is a mechanism for addressing debts obtained through fraud—11 U.S.C. § 523. *See e.g., In re Omegas Group, Inc., supra; Butcher v. Blachy (In re Blachy)*, 1995 WL 578193 (E.D.Mich. 1995).

§ 523 of the Code specifically provides the remedy of declaring nondischargeable debts arising from various types of fraud and deceit committed by the debtor. The Code endows the trustee with generous powers to bring property of imperfect title or disputed ownership into the debtor's estate for distribution according to each creditor's ability to prove its entitlement and priority in accordance with the dictates of the Code. To permit a creditor, no matter how badly he was "had" by the debtor, to lop off a piece of the estate under a con-

structive trust theory is to permit that creditor to circumvent completely the Code's equitable system of distribution.

In light of these provisions and in light of the overall purposes of the Code, § 541(d) cannot properly be invoked as an equitable panacea whenever the bankruptcy court thinks a claimant has been particularly burdened by a debtor's bad faith or bad acts.

*In re Omegas Group, Inc.*, 16 F.3d at 1453.

The *Omegas* court's reference to § 541(d) here is a response to the cases holding that constructive trusts are permissible in bankruptcy. Those cases rely primarily on § 541(d) for the proposition that:

> § 541(d) recognizes that property ostensibly the estate's may in reality be subject to superior rights. In such circumstances those rights supersede the estate's ... In other words, ... through the imposition of a constructive trust, a beneficiary can establish rights in property superior to those of the estate. Consistent with § 541(d) and with the beneficiary's interests, the property will be excluded from the estate; the beneficiary is not paid through the estate.

*In re Reider*, 177 B.R. 412, 415–16 (Bankr. D.Me.1994); *see also Clark v. Wetherill (In re Leitner)*, 236 B.R. 420 (Bankr. D.Kan.1999).

The Eighth Circuit's position in this debate is not entirely clear. Two Eighth Circuit Court of Appeals decisions have affirmed bankruptcy courts' use of the constructive trusts remedy, but, unfortunately, have done so without any discussion of the underlying issue of its propriety; rather, the court appears to have just assumed that a bankruptcy court could grant that remedy. *Chiu v. Wong*, 16 F.3d 306 (8th Cir.1994); *Abramowitz v. Palmer*, 999 F.2d 1274 (8th Cir.1993). Furthermore, the one court in the Western District addressing the issue is somewhat equivocal

in its treatment. *Shubert v. Jeter (In re Jeter)*, 171 B.R. 1015 (Bankr.W.D.Mo. 1994).

In *Jeter*, the court declined to impose a constructive trust in favor of a creditor who had been defrauded by the debtor. The decision was apparently based on a number of factors, which included the creditor's failure to meet the requirements for establishing a constructive trust under non-bankruptcy law, the incompatibility of constructive trusts with the Bankruptcy Code's policy of pro-rata, equal distribution among creditors, and the failure of the creditor to adequately trace the fraudulently obtained assets to the proposed trust res. The court indicated, at several points in the opinion, that constructive trusts are inappropriate in the bankruptcy context,[25] but also gave some indication that if the case before it was factually similar to *Abramowitz*, in which "there was fraud in the inducement and direct tracing, and the other creditors were not affected by the constructive trust," a constructive trust might have been appropriate. *Jeter*, 171 B.R. at 1021.

Because the *Jeter* court's statements on the issue were somewhat equivocal, the precedent set forth in *Chiu* and *Abramowitz* remains largely uninterpreted in the Western District. However, the Court believes that the interpretation of these cases in *Monfort, Inc. v. Kunkel (In re Morken)*, 182 B.R. 1007 (Bankr.D.Minn.1995), a case which picks up on the factual distinction between *Jeter* and *Abramowitz* to which the *Jeter* court alluded, provides a well reasoned, conservative interpretation of these cases:

> The Eighth Circuit has imposed constructive trusts under totally different circumstances. *See, e.g., Chiu v. Wong*, 16 F.3d 306 (8th Cir.1994); *Abramowitz v. Palmer*, 999 F.2d 1274 (8th Cir.1993). However, these decisions are not inconsistent with the principle that construc-

25. "By seeking a constructive trust where plaintiff could not maintain a fraudulent transfer action, plaintiff is attempting to re-

cover through a back door what he cannot recover directly." *In re Jeter*, 171 B.R. at 1022.

tive trusts conflict with the Bankruptcy Code's policy of pro rata distribution. Both Eighth Circuit cases involved creditors who had asserted ownership interests in exempt properties not property of the estate. Thus, the constructive trusts were imposed on the debtors' properties and were not detrimental to the estates' creditors. Both these cases concerned misappropriated funds which were invested by the debtors in exempt homestead properties in attempts to hide the funds from creditors to whom the funds legally belonged ... As such, these cases are easily distinguishable from the case at hand. Here, the funds at issue are property of the estate and the creditors have no ownership interest in the assets. To impose a constructive trust under these circumstances would be to prefer particular creditors over the rest of the estate's creditors.

*Monfort, Inc.*, 182 B.R. at 1023 n. 29.

 Adopting this approach, we need not reach the thorny issues of whether § 541(d) contemplates and/or authorizes the use of constructive trusts in bankruptcy, or whether constructive trusts are inimical to the Bankruptcy Code's principles of equitable distribution. Exempt property would not be available for distribution to the general body of creditors, so segregating it for distribution to one creditor only deprives the debtor of what was not rightfully his in the first place. This is precisely the situation presented in the case currently before the Court. First American seeks to have a constructive trust imposed on the Debtors' homestead that, as exempt property, would not be available to the general body of creditors. Therefore, we conclude that the Court has the authority to impose a constructive trust on the Debtors' Kansas homestead, assuming its imposition is warranted by state law.

b. Kansas law on constructive trusts.

 The existence of parties' property rights in bankruptcy depends on state law, *see, e.g. Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979), and the bankruptcy court applies the law of the state where the court sits, including the choice of law provisions. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In Missouri, constructive trust issues are to be determined according to the law of the situs of the trust res, *see Seaboard Surety Co. v. First National Bank & Trust Co. Sioux Falls,* 121 F.2d 288, 291 (8th Cir.1941), and since the trust res is Kansas real estate, we will apply Kansas law.

 Under Kansas law, a constructive trust arises "wherever the circumstances under which the property was acquired make it inequitable that it should be retained by the person who holds legal title." *Kampschroeder v. Kampschroeder,* 20 Kan.App.2d 361, 887 P.2d 1152, 1155 (1995) (quoting *Hile v. DeVries,* 17 Kan. App.2d 373, 836 P.2d 1219 (1992)). "An essential element of proving a constructive trust is a showing of fraud." *Id.* "Actionable fraud includes an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or recklessly made with disregard for the truth, where another party justifiably relies on the statement and acts to his injury." *Mahler v. Keenan Real Estate, Inc.,* 255 Kan. 593, 876 P.2d 609, 615 (1994). Additionally, a plaintiff seeking the imposition of a constructive trust must also show that the fraudulently obtained property is directly traceable to the trust res. *See Kline v. Orebaugh,* 214 Kan. 207, 519 P.2d 691, 693 (1974).

 First American has satisfied its burden in regards to all of the elements for a constructive trust under Kansas law. The requirements to establish "actionable fraud" under Kansas law are identical to the requirements for actual fraud in § 523(a)(2)(A) claims, and we have already concluded that First American has successfully established a § 523(a)(2)(A) claim against the Debtors based on actual fraud. As far as the tracing requirement, evidence adduced at trial clearly shows that First American's (as assignee of Southwest

Missouri Bank's claim) property—the proceeds from the sale of the Debtors' Missouri property—was used to purchase the Kansas real estate, which is the object of the proposed constructive trust. In addition to the evidence showing the flow of funds, Christopher Lett also testified that he would not have been able to purchase the Kansas real estate if he had paid off the mortgage to Southwest Missouri Bank.

■ In their defense, the Debtors have sought refuge in Kansas' "homestead law" claiming that it does not allow the imposition of constructive trusts on homesteads. However, the Debtors overstate the protection provided by Kansas' homestead law—Article 15, section 9, of the Kansas State Constitution. Article 15, section 9 exempts a homestead from "forced sale under any process of law" except for: (1) a sale for taxes; (2) a sale for the payment of obligations contracted for the purchase of said premises; (3) to pay obligations contracted for the erection of improvements on the homestead; and (4) any process of law obtained by virtue of a lien given by the consent of both husband and wife. K.S.A. Const. Art. 15, § 9; *see Farmers' State Bank of Kingman v. Pickering,* 111 Kan. 132, 205 P. 1110 (1922). In addition to the four exceptions in Kansas' homestead law, case law indicates that a homestead is not exempt from forced sale if it is purchased with funds in which "existing creditors have rights therein," *Metz v. Williams,* 149 Kan. 647, 88 P.2d 1093 (1939); *Long v. Murphy,* 27 Kan. 375 (Kan.1882), or where there are "peculiar equities" in favor of existing creditors. *Metz,* 88 P.2d at 1094; *McConnell v. Wolcott,* 70 Kan. 375, 383, 78 P. 848 (Kan.1904). This is precisely the situation contemplated by a constructive trust.[26] Moreover, a constructive trust is not a forced sale at all. It is not a matter of selling property to satisfy a creditor's debt; rather, a constructive trust is an equitable remedy through which property is returned to its proper owner. *See*

*McMerty v. Herzog,* 661 F.2d 1184, 1185 (8th Cir.1981) (interpreting "forced sale by law" language in similar homestead law (Minnesota) as inapplicable to the constructive trust scenario).

■ The Debtors' argument that the Court should not grant First American the equitable remedy of a constructive trust because there is an adequate remedy at law is equally unavailing. While it is true that a constructive trust is an equitable remedy and that in order to obtain such a remedy a plaintiff must show that the remedy at law is inadequate, *Huffman v. Brigance,* 128 S.W.2d 639, 645 (Mo.Ct.App. 1939), the Court finds that, in the present case, there is no adequate remedy at law.

■ "A court of equity may determine for itself the adequacy of the legal remedy." 30A C.J.S. EQUITY § 24 at 189 (1992). Taking instruction from Missouri law, we find that one way to prove that a legal remedy is inadequate is to show that the defendant is insolvent. *Buckley v. Maupin,* 344 Mo. 193, 125 S.W.2d 820, 823–824 (1939); *Farmers & Traders Bank v. Kendrick,* 341 Mo. 571, 108 S.W.2d 62, 64 (1937); *see O'Neal v. Southwest Missouri Bank of Carthage (In re Broadview Lumber Company, Inc.),* 168 B.R. 941, 964 (Bankr.W.D.Mo.1994) ("Another exception in Missouri to the rule that one cannot maintain an action in equity if an adequate remedy at law is available is where a creditor proves the other party insolvent.") (citing *Kendrick, supra.*). In the present case, the Debtors' insolvency was established when the Debtors' bankruptcy schedules were admitted into evidence without objection. Therefore, the Court finds that there is no adequate remedy at law.

Having determined that the bankruptcy court has the authority to impose a constructive trust under the present circumstances, that the Debtors' conduct warrants the imposition of a constructive trust under Kansas law, and that there is no adequate remedy at law, the Court grants

---

**26.** The Court is confident that the exceptions referred to in the case law contemplate constructive trusts, although our research has not unearthed cases applying these exceptions.

the relief requested by First American in Count III of its claim, and imposes a constructive trust in favor of First American on the Debtors' Kansas real estate.

### 6. The Debtors' counterclaims.

In their "Answer and Counterclaim" to both First American's and Green Tree's Complaints, the Debtors request attorney's fees pursuant to 11 U.S.C. § 523(d). Because we rule in favor of Plaintiffs Green Tree (pursuant to § 523(a)(6)) and First American (pursuant to §§ 523(a)(2)(A) and (a)(6)), we will deny the Debtors' request for attorney's fees.

Additionally, in their Answer and Counterclaim to First American's Complaint, the Debtors request "judgment and costs" based on an alleged violation of the Debtors' 14th Amendment right to travel [27] (Answer–Count II) and for the avoidance of the constructive trust pursuant to 11 U.S.C. § 549(a) (Counterclaim–Count III) For the reasons stated earlier, the Court rejects the Debtors' constitutional argument and denies the relief requested in Answer–Count II, and because, among other reasons, the Debtors do not have standing to seek the avoidance of a transfer pursuant to § 549(a)—only a trustee has standing under § 549—the Court also denies the relief requested in Counterclaim–Count III.

Therefore, it is

**ORDERED** that First American's Motion For Leave to File First Amended Complaint is hereby GRANTED and the First Amended Complaint is ordered filed. It is

**FURTHER ORDERED** that the relief requested in Counts I and II of First American's First Amended Complaint are hereby GRANTED and the $76,041.41 debt owed to First American is hereby declared nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6), First American is awarded attorneys' fees of $25,000.00, and the Debtors are denied a general discharge pursuant to 11 U.S.C. § 727(a)(2)(A). It is

**FURTHER ORDERED** that the relief requested in Count III of First American's First Amended Complaint is GRANTED and a constructive trust shall be imposed on the following property accordingly:

The North half (N/2) of the Northeast Quarter (NE/4) of Section Thirty-one (31) in Township Thirty-three (33) South of Range Twenty-five (25) East of the Sixth Principal Meridian, Cherokee County, Kansas, according to the United States Government Survey thereof, except that portion of deeded to the State of Kansas for highway purposes, said instrument recorded in Book 178 of Deeds at page 465 in the Office of the Register of Deeds, Cherokee County, Kansas, and subject to Pole Line Permit to the Empire District Electric Company, and subject to right-of-way easement to Rural Water District No. 2.

It is **FURTHER ORDERED** that the relief requested in Count IV of First American's First Amended Complaint is DENIED. It is

**FURTHER ORDERED** that the relief requested in Counts I and II of Green Tree's Complaint is DENIED. It is

**FURTHER ORDERED** that the $27,296.25 debt the Debtors owed to Green Tree is hereby declared nondischargeable pursuant to 11 U.S.C. § 523(a)(6). It is

**FURTHER ORDERED** that all of the relief requested in Debtors' Answer and Counterclaim to First American's Complaint is DENIED. It is

**FURTHER ORDERED** that all of the relief requested in Debtors' Answer and Counterclaim to Green Tree's Complaint is DENIED.

The Clerk is directed to enter judgment in accordance with this Opinion.

**SO ORDERED.**

---

27. See supra note 1.